PROCTER & GAMBLE COMPANY *v.* UNITED
STATES OF AMÉRICA, INTERSTATE COM-
MERCE COMMISSION, CINCINNATI, HAMIL-
TON & DAYTON RAILWAY COMPANY, ET AL.

APPEAL FROM THE UNITED STATES COMMERCE COURT.

No. 780.   Argued January 11, 12, 1912.—Decided June 7, 1912.

Subdivision 2 of § 1 of the act creating the Commerce Court, now § 207
of the new Judicial Code, giving the Commerce Court jurisdiction
of cases brought to enjoin, set aside, annul or suspend orders of the
Interstate Commerce Commission, confers on that court jurisdiction
only to entertain complaints as to affirmative orders of the Commis-
sion.

Under the act, the Commerce Court is not given jurisdiction to redress
complaints based exclusively, as in this case, on the ground that
the Commission has refused the relief asked on the ground that it
could not award it.

To construe the act creating the Commerce Court so as to give it juris-
diction to originally interpret the administrative features of the
Interstate Commerce Act and to construe a refusal of the Commission
to grant relief as an affirmative order would frustrate the legislative
policy which led to the adoption of the act and would multiply the
evils which it was designed to prevent.

The act creating the Commerce Court was intended to be a part of the
existing system for regulating interstate commerce.   While originally
the duty of determining whether an order of the Commission should
be enforced carried with it the obligation to consider both the facts
and the law, it had come to pass prior to the adoption of the act
creating the Commerce Court that the jurisdiction of courts over or-
ders of the Commission is confined to determining whether they were
in violation of the Constitution or failed to conform to statutory
authority, and to ascertaining whether power had been arbitrarily
exercised beyond the power conferred.

Under the express reservation in the last paragraph of § 207, Judicial
Code, a claim that a constitutional right asserted in a petition to the
Interstate Commerce Commission has been denied by that body, if
independent of all questions of rights and remedies under the Inter-

state Commerce Act, is beyond the jurisdiction of the Commerce Court.

Where the constitutional question is dependent upon provisions of the Interstate Commerce Act, it is subject to the precedent action of the Commission, as to which the Commerce Court only has jurisdiction in case of a prior affirmative order of the Commission.

The Commerce Court has no jurisdiction over a claim made by the owner of private cars to recover on a money demand based on the illegality of charges alleged to have been wrongfully exacted by the railroad companies and which the Commission had refused to allow.

188 Fed. Rep. 221, reversed.

THE facts, which involve the construction of the statute creating the Commerce Court and the determination of extent of jurisdiction of that court, are stated in the opinion.

*Mr. George H. Warington* for appellants.[1]

*Mr. Francis B. James,* for appellants in Nos. 773 and 774, argued simultaneously herewith. See p. 302, *post.*

*Mr. Assistant Attorney General Denison,* with whom *Mr. Blackburn Esterline,* Special Assistant to the Attorney General, was on the brief, for the United States:[1]

The Commerce Court was given no jurisdiction to set aside the order of the Commission which merely refused relief and dismissed the petition. The Commerce Court is given no jurisdiction not heretofore possessed by the Circuit Courts; and there is no precedent in the common law for a suit in equity to establish a future reasonable rate, or to enjoin the future operation of a rule of a railroad on the ground that it was unreasonable.

Nor has there been any instance in which, since the establishment of the Interstate Commerce Commission, any Federal court has undertaken that power, or has been asked to undertake it.

---

[1] See also abstract of argument of appellant in Nos. 773 and 774, p. 303, *post.*

Even the Interstate Commerce Commission itself had no authority to establish reasonable rates for the future, prior to the express grant of that power by the Hepburn Act.

The legislation of Congress clearly shows that no such jurisdiction was intended to be given either to the Circuit Courts by the Hepburn Act, or to the Commerce Court by the Commerce Court Act.

The Hepburn Act shows in several sections that only affirmative orders of the Commission, that is to say, orders which required some change from existing conditions, were the subject of jurisdiction in the Circuit Courts.

Similarly, the Commerce Court Act in several sections indicates the same intention.

This particular petition asked as one element of relief that the Commerce Court should require the railroads to pay money to the petitioners. The court had no power to take jurisdiction of such a claim for money, because such claims are left by the Commerce Court Act to the Circuit Courts. The Commerce Court would have been given the aid of a jury system if it had been intended to have this jurisdiction.

*Mr. P. J. Farrell* for the Interstate Commerce Commission.

*Mr. Edward Barton* for the Cincinnati, Hamilton & Dayton Railway Company, appellee.

Mr. CHIEF JUSTICE WHITE delivered the opinion of the court.

Having three manufacturing plants, one at Ivorydale, Ohio, a second at Port Ivory, New York, and a third at Kansas City, Kansas, in which they carried on the business of refining cottonseed and other oils and of manufacturing soap and other products from grease and oil, the Procter &

Gamble Company, to facilitate the transportation to their factories of the substances required for their operation and of shipping out the finished products, became the owner of about five hundred railroad tank cars. The cars were exclusively devoted to the business of the company in the following manner: On the property of the company in the yards about their factories there were railroad tracks belonging to the company which served for holding empty or loaded cars, the cars thus situated being held for storage and for movement from place to place, as business required. At each of the factories there was also an interchange track connected with the tracks in the yards and with the tracks of the railroad company or companies through whom the business of shipping in interstate commerce to and from the factories was carried on. The movement of cars to the interchange tracks for outward shipment and from the interchange tracks when they were left there by railroad companies was at two of the factories carried on by the company through its own employés and motive power. At the other one this work was done by a railroad company, who made an independent and special charge for the service. The transportation of the private tank cars of the corporation by the railroad companies was governed by established rules, and the price paid to the railroads for transporting the commodities of the company in its private cars was the regular price fixed for such commodities in the established tariffs. The railroads, however, paid to the company for the use of its private cars a fixed sum per mile, this payment being also stated in the regular established tariffs in compliance with law. A portion of the carrier's rule (Rule 29), relating to the subject of compensation for hauling such private tank cars is in the margin.[1]

---

[1] Rule 29. (Sec. 1.) In providing ratings in this classification for articles in tank cars, the carriers whose tariffs are governed by this classification do not assume any obligation to furnish tank cars in

In 1910 among others the railroads engaged in transporting tank cars from the plants of the Procter & Gamble Company adopted a system of rules governing the payment of demurrage by shippers. The provisions of these rules pertinent to this case are excerpted in the margin.[1]

The rules in question were prepared by a committee of the National Association of Railroad Commissioners composed of a representative from each State having a rail-

_____

cases where they do not own or have not made arrangements for supplying such equipment. When tank cars are furnished by shippers or owners, mileage at the rate of three-quarters ($3/4$) of one cent per mile will be allowed for the use of such tank cars, loaded or empty, provided the cars are properly equipped. No mileage will be allowed on cars switched at terminals nor for movement of cars under empty freight car tariffs.

[1] Rule I.

Cars subject to Rules.

Cars held for or by consignors or consignees for loading, unloading, forwarding directions, or for any other purpose, are subject to these demurrage rules, except as follows:

(a) Cars loaded with live stock.

(b) Empty cars placed for loading coal at mines or mine sidings, or coke at coke ovens.

(c) Empty private cars stored on carrier's or private tracks, provided such cars have not been placed or tendered for loading on the order of a shipper.

NOTE.—Private cars while in railroad service, whether on carrier's or private tracks, are subject to these demurrage rules to the same extent as cars of railroad ownership.

(Empty private cars are in railroad service from the time they are placed by the carriers for loading or tendered for loading on the orders of a shipper. Private cars under lading are in railroad service until the lading is removed and cars are regularly released. Cars which belong to an industry performing its own switching service are in railroad service from the time they are placed by the industry upon designated interchange tracks and thereby tendered to the carrier for movement. If such cars are subsequently returned empty, they are out of service when withdrawn by the industry from the interchange; if returned under load, railroad service is not at an end until the lading is duly removed.)

road commission and a member of the Interstate Commerce Commission, and were adopted in convention by the National Association and were subsequently approved by the Interstate Commerce Commission, although putting them in force was not imperatively prescribed by that body.

The Procter & Gamble Company, dissatisfied with the regulations concerning demurrage, in so far as they imposed in certain respects charges upon its tank cars, filed a complaint with the Interstate Commerce Commission charging the rules to be repugnant to the act to regulate commerce because unjust and oppressive and because to enforce them would create preferences and discriminations forbidden by the act. After hearing, the Commission made a report declaring that the rules complained of were in no sense in conflict with the act to regulate commerce, and on the contrary conformed to that act and tended to prevent and repress unlawful preferences and discriminations. An award of relief was therefore denied. In February, 1911, the Procter & Gamble Company filed a petition in the Commerce Court of the United States making defendants the United States, the Interstate Commerce Commission and the railroads who had been complained of in the proceeding before the Commission. The petition recited the facts stated above as to the character of the business of the petitioner, the ownership of tank cars, etc., the establishment of the rules for demurrage, their repugnancy to the act to regulate commerce, the injury which had resulted from being compelled to pay the charges for demurrage in accordance with the rules, the application made to the Commission and the refusal of that body to award relief. The conception upon which the petition was based is shown in the excerpt in the margin,[1] wherein it was also charged that the order of the

---

[1] Complainant avers that said order of said Interstate Commerce Commission, in dismissing its complaint as above set forth, is null and

Commission dismissing the complaint as above set forth "is null and void and beyond the power of said Interstate Commerce Commission, in that it sustains the validity of . . . said demurrage rules."

The prayer was as follows:

"Wherefore, complainant prays that the aforesaid order of said Interstate. Commerce Commission made in said cause No. 3208 on November 14, 1910, be set aside and annulled, and that the defendant railway companies, and each of them, be enjoined from collecting or attempting to collect any demurrage charges upon complainant's loaded tank cars after said cars have been delivered to complainant and placed upon tracks owned or controlled by it; and further, that said defendant railway companies and each of them be required to repay to complainant herein all sums found to have been wrongfully collected by them, or any of them, under the rule here complained of; and

void and beyond the power of said Interstate Commerce Commission, in that it sustains the validity of Rule I of said demurrage; that said Rule I in so far as it provides that privately owned cars under lading on private tracks are in railroad service and subject to the demurrage charges imposed by said tariffs until the lading is removed, is unjust and unreasonable, in that it deprives complainant of the right to use its said private cars upon private tracks for its own purposes without paying the defendant railway companies demurrage charges therefor, after said private cars have been delivered to complainant and have actually ceased to be engaged in railroad service; that the charges exacted by the defendant railway companies of complainant under said provision of said rule permit said defendants to take complainant's property without compensation, and deprive it of its property without due process of law, in violation of the Constitution of the United States, and particularly of Article V in amendment thereof, and that said provision of said rule is in violation of the said Act to Regulate Commerce and particularly of §§ 1 and 15 thereof as amended June 29, 1906; that said defendants are now exacting such demurrage charges under the provisions of said rule, and will continue to do so, unless the said order of said Interstate Commerce Commission is set aside and annulled by this court, and defendant railway companies are enjoined from enforcing the provisions of said rule.

that complainant be granted such other and further relief as it may be entitled to in the premises."

The railroads answered the bill. The United States and the Interstate Commerce Commission appearing for the purpose, challenged the jurisdiction of the court to entertain the cause, and moved to dismiss, upon this general ground: "Because the order of the Interstate Commerce Commission complained of directed no affirmative relief and the negative order of the Commission dismissing the complaint affords no ground for an action in this court;" and upon the following more detailed specifications filed on behalf of the United States:

"(a) It prays that the order of the Interstate Commerce Commission be enjoined, when said order directed no action against any party and therefore the same is not subject either to enforcement or to injunction.

"(b) It prays that the defendant common carriers, who are not proper parties to this proceeding except on their own motion, be enjoined from collecting the demurrage mentioned, when no order inhibiting the same has been made by the Interstate Commerce Commission, and in the absence of such an order this court has no power to grant such relief:

"(c) It prays that the defendant common carriers be required to repay to complainant all sums heretofore wrongfully collected as demurrage, when this court has no power or jurisdiction to grant such relief, either with or without an order of the Interstate Commerce Commission directing such repayment."

The court, declining at the threshold to consider the demurrers and motion to dismiss, postponed their consideration until the hearing on the merits. There was a consent by all the defendants except the United States and the Interstate Commerce Commission that the case be heard upon the evidence and documents introduced before the Commission and the report of that body. The

United States and the Interstate Commerce Commission, however, on the overruling of its demurrer and a refusal to grant its motion to dismiss, elected to stand thereon and declined to plead further.

In disposing of the case, the court considered it in a two-fold aspect—first, as to its jurisdiction; and, second, as to the merits of the case. On the first subject it held, *a*, that it had jurisdiction of the cause, and that the refusal of the Interstate Commerce Commission to afford relief to the Procter & Gamble Company was, for the purposes of jurisdiction of the court, the exact equivalent of an order of the Commission granting affirmative relief, and, *b*, as a corollary of this power it was further decided that there was jurisdiction to award pecuniary relief for demurrage if any was illegally exacted. On the merits, however, it was decided that the Interstate Commerce Commission had rightfully refused to grant relief and that there was no foundation for the contention that the property of the company in its private tank cars was taken without due process of law by the demurrage regulations. On this subject it was declared that as the company had accepted the provisions of the published tariffs concerning the use of the tank cars, therefore those cars were submitted to the regulations which the carriers had lawfully established. In other words, the court concluded that because the company had availed of the proffer of the railroads to use the cars in transportation and pay for their use a stated sum, the company had acquired no right to disregard restrictions against preferences and discriminations embodied in the act to regulate commerce.

The case was then brought here by the appeal of the Procter & Gamble Company. That company insists that the court below erred in not awarding the relief which was asked and in dismissing the petition. On the other hand the Interstate Commerce Commission and the railroads insist that the court was right in refusing relief and dis-

missing the bill. Before we can come, if at all, to consider the merits, however, it is necessary to dispose of the question concerning the jurisdiction of the court below to entertain the petition, because the United States insists at bar, as it did in the lower court, that the court erred in overruling the demurrer to the jurisdiction and refusing to dismiss the cause for want of jurisdiction.

The provisions of the act to establish the Commerce Court fixing the jurisdiction of that court are stated in the first section of the act of June 18, 1910, 36 Stat. 539, c. 309, now § 207 of the Judiciary Act of March 3, 1911, 36 Stat. 1087, 1148. And in view of the necessity of having the provisions of the section immediately in mind we reproduce them. They are as follows:

"SEC. 207. The Commerce Court shall have the jurisdiction possessed by circuit courts of the United States and the judges thereof immediately prior to June eighteenth, nineteen hundred and ten, over all cases of the following kinds:

"First. All cases for the enforcement, otherwise than by adjudication and collection of a forfeiture or penalty or by infliction of criminal punishment, of any order of the Interstate Commerce Commission other than for the payment of money.

"Second. Cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission.

"Third. Such cases as by section three of the Act entitled 'An Act to further regulate commerce with foreign nations and among the States,' approved February nineteenth, nineteen hundred and three, are authorized to be maintained in a circuit court of the United States.

"Fourth. All such mandamus proceedings as under the provisions of section twenty or section twenty-three of the Act entitled 'An Act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, as

amended, are authorized to be maintained in a circuit court of the United States.

"Nothing contained in this chapter shall be construed as enlarging the jurisdiction now possessed by the circuit courts of the United States or the judges thereof, that is hereby transferred to and vested in the Commerce Court.

"The jurisdiction of the Commerce Court over cases of the foregoing classes shall be exclusive; but this chapter shall not affect the jurisdiction possessed by any circuit or district court of the United States over cases or proceedings of a kind not within the above-enumerated classes."

The question to be decided is this: Does the authority with which the Commerce Court is clothed in virtue of these provisions invest that body with jurisdiction to redress complaints based exclusively upon the conception that the Interstate Commerce Commission, in a matter submitted to its judgment and within its competency to consider, has mistakenly refused, upon the ground that no right to the relief claimed was given by the act to regulate commerce, to award the relief which was claimed at its hands? In other words, the important question is, Is the authority of the Commerce Court confined to enforcing or restraining, as the case may require, affirmative orders of the Commission, or has it the power to exert its own judgment by originally interpreting the administrative features of the act to regulate commerce and upon that assumption treat a refusal of the Commission to grant relief as an affirmative order and accordingly pass on its correctness?

Turning for the elucidation of the question to the jurisdictional provisions, it is plain that although all of the four numbered subdivisions composing the section may serve to throw light upon the issue for decision the solution of the question must intrinsically be found in a correct interpretation of the second subdivision. We say this because clearly the first deals alone with cases for the en-

forcement of orders of the Commission as therein described; the third deals only with cases brought under the act of February 19, 1903, which is wholly foreign to the subject here reviewed, since the act referred to relate only to proceedings to enjoin either discriminations or departures by carriers from their published rates, and the fourth refers exclusively to the right to mandamus conformably to § 20 or 23 of the act to regulate commerce, which sections are concerned with the performance of certain duties imposed upon carriers by the act to regulate commerce. The words of this second subdivision are: "Second. Cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission."

Giving to these words their natural significance we think it follows that they confer jurisdiction only to entertain complaints as to affirmative orders of the Commission; that is, they give the court the right to take cognizance when properly made of complaints concerning the legality of orders, rendered by the Commission and confer power to relieve parties in whole or in part from the duty of obedience to orders which are found to be illegal. No resort to exposition can add to the cogency with which the conclusion stated is compelled by the plain meaning of the words themselves. But if it be conceded for the sake of argument that the language of the provision is ambiguous a consideration of the context of the act will at once clarify the subject. Thus, the first subdivision provides for the enforcement of orders, that is, the compelling of the doing or abstaining from doing of acts embraced by a previous affirmative command of the Commission, and the second (the one with which we are concerned) dealing with the same subject from a reverse point of view, provides for the contingency of a complaint made to the court by one seeking to prevent the enforcement of orders of the Commission such as are contemplated by

the first paragraph. In other words, by the coöperation of the two paragraphs, authority is given on the one hand, to enforce compliance with the orders of the Commission if lawful, and, on the other hand, power is conferred to stay the enforcement of an illegal order. The other provisions of the act are equally convincing. Thus, § 3 (208), provides that the mere pendency of a suit to enjoin, set aside, annul or suspend an order of the Commission "shall not stay or suspend the operation of such order" but confers upon the court the power, under circumstances stated, to restrain or suspend in whole or in part the operation of an order. The same section, moreover, causes the meaning of the provision, if possible, to become clearer by making a finding that irreparable injury will result from the operation of an order sought to be enforced, essential to the granting of an order or injunction restraining or suspending its enforcement.

We might well be content to rest our conclusion upon the considerations just stated. In view, however, of the importance of the subject we do not do so, but shall consider the matter in a broader aspect for the purpose of demonstrating that to give to the statute a meaning contrary to that which we have found results from its text, and therefore to recognize the existence in the court below of the power which it deemed it possessed would result in frustrating the legislative public policy which led to the adoption of the act to regulate commerce, would render impossible a resort to the remedies which the statute was enacted to afford, would multiply the evils which the act to regulate commerce was adopted to prevent, and thus bring about disaster by creating confusion and conflict where clearness and unity of action was contemplated. It cannot be disputed that the act creating the Commerce Court was intended to be but a part of the existing system for the regulation of interstate commerce, which was established by virtue of the original adoption in 1887 of the

act to regulate commerce, and which was expanded by
the repeated amendments of that act which followed,
developed in practical execution by the rulings of the body
(Interstate Commerce Commission), upon whom was cast
the administrative enforcement of the act, the whole
elucidated and sanctioned by a long line of decisions of
this court.   That in adopting the provisions concerning
the Commerce Court and making it part of the system, it
was not intended to destroy the existing machinery or
method of regulation, but to cause it to be more efficient
by affording a more harmonious means for securing the
judicial enforcement of the act to regulate commerce is
certain.   The act creating the Commerce Court (June 18,
1910, 36 Stat. 539, c. 309) was entitled "An Act to create
a Commerce Court, and to amend the Act entitled 'An
Act to regulate commerce,' approved February fourth,
eighteen hundred and eighty-seven, as heretofore amended,
and for other purposes."   The first six sections, which
called into being the Commerce Court and defined its
powers, all demonstrate the purpose as above stated, that
is, to adjust the powers and duties of the newly created
court in such manner as to cause them to accord with the
system of regulation provided by the act to regulate com-
merce as it then existed.

What was then the existing system and the functions
which the new court was created to perform will be con-
clusively shown by a brief outline of the scope and purpose
of the system which arose from the enactment of the act
to regulate commerce (Act February 4, 1887, c. 104, 24
Stat. 379) and its development.   By that act as originally
enacted many regulations and consequent duties were
imposed upon carriers in the interest of the public and of
shippers which did not theretofore exist, and various ad-
ministrative safeguards were formulated, all of which, in
their very essence, required, first, for their compulsory en-
forcement the exercise of official functions of an adminis-

trative nature, and, second, for their harmonious development an official unity of action which could only be brought about by a single administrative initiative and primary control. To that end the act (§ 11) created an administrative body endowed with what may be in some respects qualified as *quasi*-judicial attributes, to whom was confided the enforcement of those provisions of the act which essentially exacted unity in order that they might beneficially operate. And for the purposes stated, to the body thus created was committed the trust of enforcing the act in the respect stated, of determining, limited as to the subject-matters to which we have referred, whether the provisions of the act had been violated and if so of primarily enforcing the act by awarding appropriate relief. The statute, therefore, necessarily, while it created new rights in favor of shippers, in order to make those rights fruitful as to the subjects with which the statute dealt coming within the scope of the administrative unity which we have mentioned primarily made the judgment of the administrative body to whom the statute confided the enforcement of the act in the respects stated a prerequisite to a resort to the courts. In other words, as to the subjects stated the act did not give to the courts power to hear the complaint of a party concerning a violation of the act, but only conferred power to give effect to such complaints, when by previous submission to the Commission, they had been sanctioned by a command of that body.

In the long interval which intervened between 1887 when the act to regulate commerce was enacted and June 18, 1910, when the Commerce Court act was passed we have learned of no instance where it was held or even seriously asserted, that as to subjects which in their nature were administrative and within the competency of the Commission to decide, there was power in a court, by an exercise of original action, to enforce its conceptions as

to the meaning of the act to regulate commerce by dealing directly with the subject irrespective of any prior affirmative command or action by the Interstate Commerce Commission. On the contrary, by a long line of decisions, whereby applications to enforce orders of the Commission were considered and disposed of or where requests to restrain the enforcement of such orders were passed upon, it appears by the reasoning indulged in that it was never considered that there was power in the courts as an original question without previous affirmative action by the Commission to deal with what might be termed in a broad sense the administrative features of the act to regulate commerce by determining as an original question that there had been a compliance or non-compliance with the provisions of the act. The subject is illustrated and made clear by the rulings in *State of Washington, ex rel. Oregon Railroad & Navigation Co.* v. *Fairchild,* 224 U. S. 510; *Robinson* v. *Balto. & Ohio R. R.,* 222 U. S. 506; *Southern Railway Co.* v. *Reid,* 222 U. S. 424, and *Texas & Pacific Ry.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426. The latter case especially will serve to point out that where the power of original action by a court without previous action of the Commission was insisted upon, it was based upon the conception that the particular subject-matter as to which such power was asserted was by the express terms of the act to regulate commerce not embraced within the subjects primarily confided by the act exclusively to the administrative authority of the Commission.

Originally the duty of the courts to determine whether an order of the Commission should or should not be enforced carried with it the obligation to consider both the facts and the law. But it had come to pass prior to the passage of the act creating the Commerce Court that in considering the subject of orders of the Commission, for the purpose of enforcing or restraining their enforcement, the courts

were confined by statutory operation to determining whether there had been violations of the Constitution, a want of conformity to statutory authority, or of ascertaining whether power had been so arbitrarily exercised as virtually to transcend the authority conferred although it may be not technically doing so. *Int. Com. Comm.* v. *Union Pacific R. R.*, 222 U. S. 541, 547; *Int. Com. Comm.* v. *Ill. Cent. R. R.*, 215 U. S. 452. So also at the time the law creating the Commerce Court was passed, suits to compel obedience to orders of the Commission or to restrain an enforcement of such orders were required to be brought in the Circuit Court of the United States in the district where a carrier or one of two or more carriers to whom the order was directed had its principal operating office.

In view of the provisions of the act to regulate commerce just referred to as originally enacted, of the legislative evolution of that act, its uniform practical enforcement and the constant judicial interpretation which we have thus briefly indicated, it is impossible, we think, in reason, to give to the act creating the Commerce Court the meaning affixed to it by the court below, since to do so would be virtually to overthrow the entire system which had arisen from the adoption and enforcement of the act to regulate commerce. First, because as the previous ascertainment by the Commission on complaint made to it as to whether violations of the act had been committed, with reference to the subjects as to which previous action was required, was an essential prerequisite to a right to complain in a court, the interpretation given below would, by destroying the necessity for the prerequisite, action of the Commission, operate to create a vast body of rights which had no existence at the time the Commerce Court act was passed. Second, because the recognition of a right in a court to assert the power now claimed would of necessity amount to a substitution of

the court for the Commission or at all events would be to
create a divided authority on a matter where. from the
beginning primary singleness of action and unity was
deemed to be imperative. Third, because the result of
the interpretation would be to bring about the contradic-
tion and the confusion which it had been the inflexible
purpose of the lawmaker from the beginning to guard
against, an interpretation which would seemingly create
rights hitherto non-existent and yet at once proceed to
destroy such rights by bringing about a confusion which
would render the rights which the act creates practically
valueless. Indeed, these inevitable results of the inter-
pretation given by the court below to the act would nec-
essarily amount to declaring that Congress in seeking to
unify and perfect the administrative machinery of the act
to regulate commerce and to make more beneficial its
operation had overthrown the whole fabric of the.system
as previously existing.

The. demonstration of the error of the construction
adopted below is so additionally made manifest by a con-
sideration of the general structure and the text of the act
creating the Commerce Court, that in connection with the
legislative history which we have previously stated, that
we advert to that point of view: A. The first section of the
act wherein is recited the jurisdiction of the Commerce
Court which we have, previously commented upon makes
clear that the purpose was not to create a court with new
and strange powers destructive of the previous well-
established administrative authority of the Interstate
Commerce Commission and in conflict with the general
jurisdiction vested in the courts of the United States, but
only to give to the new court the special jurisdiction. then
possessed by the courts of the United States for the en-
forcement of orders made by the Commission, and thus to
unify the exertion of judicial power with reference to
the enforcement of the orders of the Commission. The

opening words of the section which make this result clear are as follows: It (the Commerce Court) shall "have the jurisdiction now possessed by circuit courts of the United States and the judges thereof over all cases of the following kinds: . . ." B. Because the enumeration as to the subject-matters of jurisdiction conferred which follows the words just quoted, which enumeration we have previously reproduced and commented upon, conforms to the existing law and evidently assumes its continued operation. C. Because the sedulous effort of Congress while creating the new machinery not to destroy the existing system finds expression in a two-fold way: (1) by the declaration that nothing in the fact that the existing power of the Circuit Courts as to the subjects of jurisdiction transferred to the new court should be deemed as an enlarging of those powers, and (2) by the provision that nothing in the transfer of the enumerated powers to the Commerce Court should be considered as limiting or abridging the existing jurisdiction possessed by the Circuit Courts as to things and subject-matters not embraced in the powers transferred. Thus the two provisos again serving to make clear the legislative intent that the creation of a new body to exercise a portion of the existing judicial power should not in any way enlarge the power as existing or be implied as destroying or minimizing the general scope of the judicial power possessed by the Circuit Courts where such power was not embraced within the authority transferred to the new body. D. Because the act which created the court contained in its latter sections provisions amending sections of the act to regulate commerce which when rightly interpreted were manifestly adopted to make that act more consistent with the new situation resulting from the creation of the new court and utterly inconsistent with the conception that that court had power not previously possessed by any court and the existence of which would serve to set

at naught the whole system of interstate commerce regulation.

Some suggestion is made in argument concerning the alleged claim of constitutional right asserted in the petition filed below and which the court disposed of in the manner we have stated. But what we have said suffices to point out the fallacy which the contention involves, for the following reasons: If the claim of constitutional rights concerned a subject which from its very nature and effect dominated the act to regulate commerce and therefore was wholly independent of all questions of right or remedy created by or depending upon that statute, then the issue presented a controversy not cognizable in the Commerce Court, as it could not so be without violating the express reservation and restriction as to the general power of the Circuit Courts which we have just quoted. If, on the other hand, the constitutional question was involved in or depended upon the provisions of the act to regulate commerce that question in the nature of things was subject to the precedent action of the Commission on the subjects committed to it by the act to regulate commerce and as to which the court had jurisdiction alone to act in virtue of a prior affirmative order of the Commission.

The general considerations which we have stated establish the error committed by the court below in holding that it had jurisdiction over the claim of the Procter & Gamble Company to recover on a money demand based on the illegality of the demurrage charges alleged to have been wrongfully exacted by the railroad companies. Through abundance of precaution, we, however, say that wholly irrespective of the general considerations stated we think the conclusion of the court as to its possession of jurisdiction over the subject referred to was clearly repugnant in other respects to the express terms of the act.

As it follows from what we have said that the court below erred in taking jurisdiction of the petition, it results

that our duty is to remand the cause to the court below with directions to dismiss the petition for want of jurisdiction;

*And it is so ordered.*