**ALEXANDER SPRUNT & SON, Inc., et al. v. UNITED STATES et al.**

**TEXAS & N. O. R. CO. et al. v. SAME.**

District Court, S. D. Texas. December 5, 1927.

Nos. 310, 311.

Commerce ⊂⊃85(6)—Interstate Commerce Commission has power to prescribe rate to remove discrimination without a finding that it is reasonable per se (Interstate Commerce Act, § 15 [49 USCA § 15]).

In a proceeding before the Interstate Commerce Commission to correct an alleged discrimination in rates under Interstate Commerce Act, § 15 (49 USCA § 15; Comp. St. § 8583). The commission has power to prescribe a rate found to be "just, fair, and reasonable" for the purpose of removing the discrimination without making a finding that it is just and reasonable per se.

In Equity. Suits by Alexander Sprunt & Son, Inc., and others, and by the Texas & New Orleans Railroad Company and others, against the United States and the Interstate Commerce Commission. Consolidated for hearing. Bill dismissed.

Fulbright, Crooker & Freeman, of Houston, Tex., R. L. Batts, of Austin, Tex., and C. K. Bullard, of Dallas, Tex. (R. C. Fulbright, of Houston, Tex., of counsel), for plaintiff Alexander Sprunt & Son, Inc.

A. L. Reed, of Dallas, Tex., for interveners.

M. H. Royston, of Galveston, Tex., and Baker, Botts, Parker & Garwood, of Houston, Tex., for plaintiff Texas & N. O. R. Co.

Terry, Cavin & Mills, of Galveston, Tex., for plaintiff Sante Fé Ry.

C. C. Huff, of Dallas, Tex., for plaintiff Missouri, K. & T. R. Co.

T. D. Gresham, of Dallas, Tex., for plaintiff Texas & P. R. Co.

Frank H. Moore, of Kansas City, Mo., for plaintiff Kansas City Ry. Co.

Andrews, Streetman, Logue & Mobley, of Houston, Tex., Thompson & Barwise, of Fort Worth, Tex., and Ames, Lowe & Cochran, of Oklahoma City, Okl., for other plaintiffs.

P. J. Farrell and J. Stanley Payne, both of Washington, D. C., for defendant Interstate Commerce Commission.

Blackburn Esterline, of Washington, D. C., and Wayne G. Borah and T. M. L. Bruns, U. S. Attys., both of New Orleans, La.

Before FOSTER, Circuit Judge, and BURNS and HUTCHESON, District Judges.

HUTCHESON, District Judge. These two suits involve the same questions, and were tried together. They are brought to enjoin the enforcement of an order of the Interstate Commerce Commission requiring the carriers to equalize export and domestic rates on cotton at Gulf ports.

In suit No. 310, the plaintiffs are owners of water front cotton compresses and warehouses at Houston, Tex., and others having similar interests. In suit to No. 311 the plaintiffs are railroads. The bills are very lengthy, but it is not necessary to state them, as the main contentions of plaintiffs will be briefly referred to later.

In proceedings to which various railroads, shippers, cotton warehouses, and compress owners, and interested public commercial bodies were parties, the Interstate Commerce Commission investigated rates, charges, and practices relative to the shipment of cotton from points in Arkansas, Oklahoma, Louisiana, and Texas to Gulf ports. 77 Interst. Com. Com'n R. 388; 100 Interst. Com. Com'n R. 159; 123 Interst. Com. Com'n R. 685.

The reports of the Commission, initially and on rehearing, are quite lengthy and somewhat involved. For the purpose of these cases it is sufficient to refer briefly to certain material facts found, using those pertinent to Houston as illustrating the general principles underlying the case.

It appears that cotton is concentrated at interior points, where it is compressed to a certain degree, and then shipped into Houston, where it is further compressed to higher density before being exported, in order to effect a saving in ocean freight rates.

The tariffs for many years have allowed one free stoppage in transit for compression and merchandising, which latter term comprehends the weighing, sorting, marking, and grading of cotton. For a number of years there have been two rates in force at the port of Houston, 80 cents per hundred pounds for local delivery, applicable throughout the switching limits, and 85 cents for export, which latter includes freight charges of about 1.5 cents per hundred pounds, making a spread between domestic and export rates of 3.5 cents, this difference representing not the absolute, but the approximate average cost of transferring cotton from the city compresses and warehouses back of the water front, hereinafter called "uptown" facilities, to shipside.

Prior to the beginning of this present controversy, there were no warehouses on the water front. There were warehouses and high density compresses in Houston, situated back from the water front, and in the switch-

ing limits, at a distance of from one to five miles.

Under this two-rate plan, the uptown facilities could bring their cotton in on the domestic rate of 80 cents, and, after merchandising or compressing it, declare it for export, when the railroads would carry it to the port for an additional sum of 3½ cents. On the other hand, the uptown facilities might, and usually did, prefer to dray their cotton to shipside, paying the expense themselves. In either event, it would cost them, to get their cotton to shipside, about 83.5 cents.

This was the practice which the railroads had inaugurated to equalize the uptown facilities using domestic rates, with interior compresses using export rates, so that whether cotton moved to port on an export rate, with the privilege of stoppage in transit, or moved on the domestic rate, it would cost the uptown facilities the same to get it to shipside.

This practice was approved by the Commission in Louisiana Cotton, 46 Interst. Com. Com'n R. 451, and Galveston Commercial Association v. A. & V. Ry., 77 Interst. Com. Com'n R. 388.

At the time of these proceedings, all the warehouses and compresses at the ports were back from the water, requiring further transportation to reach shipside, and the practice of making export rates higher than domestic rates by an amount not more than the cost of delivering the cotton from "uptown" to shipside resulted in an equality between all competing facilities, and all parties were satisfied.

Commencing in 1921, through the placing of high density compresses on the piers of the Galveston Wharf Company, followed later by the erection of large warehouses with compresses on the water front at Houston, disturbing influences were injected into the situation by reason of the fact that facilities, hereafter called "water front," were able in some cases to deliver a great part of their cotton, in other cases all of it, by trucks or equivalents, to shipside.

Tariffs do not define shipside delivery. Under the practice of these ports it consists in delivery to within 200 feet of the ship's tackle. The water front warehouses at Houston are so arranged that a considerable part of the cotton may be placed within that distance from the ship's tackle by the judicious berthing of ships, and these warehouses are also provided with an electric trolley system for handling the cotton when stored too far for ordinary stevedoring.

These warehouses, by using the domestic rate of 80 cents, can get their cotton within reach of shipside by trucks or equivalents 3½ cents cheaper than the interior and "uptown" facilities.

. This situation resulted in the filing of a complaint by Weatherford, Crump & Co. in docket 13991, asking for the abolition of the two-rate plan. While that proceeding was pending, the Commission instituted an investigation of its own in .No. 14940 and consolidated No. 13991 with it.

At the conclusion of the investigation and hearing thus instituted, the Commission, on June 23, 1925, filed its report which found, in substance, that the existence of the two-rate plan was unduly prejudicial to warehouses and compresses located at interior points and back from the water front at ports, and unduly preferential of warehouses and compresses located on the water front, and, as the result of these proceedings, carriers were ordered "to readjust their rates so that such rates would not exceed the domestic rates by more than the wharfage charges."

Thereafter the carriers, upon the ground that they could not remove the preference in the manner indicated in the order of the Commission without violating its previous order in docket No. 11965, and for the further reason that the carriers and interested parties had not been able to agree upon the rate to equalize the carriers' revenues and remove the discrimination, filed a petition to reopen, and, upon this petition and that of certain persons not parties to the original proceeding, but plaintiffs in equity No. 310, the Commission, by order, directed the reopening.

The order among other things, provided:

"It is further ordered that said proceedings , be, and they are hereby, reopened for further hearing, in order to determine whether conditions exist which were not developed during previous hearings, or whether changes have taken place which would justify any modification of our finding in 100 I. C. C. 159 * * * to determine what rates should be established to comply with our finding and order. * * *"

After extensive hearings, the Commission filed its report on April 4, 1927, and promulgated the order from which the plaintiffs in the cases at bar are seeking relief. In the report the Commission reaffirmed its finding that the two-rate plan was unduly prejudicial and should be abolished, and found that the carriers should inaugurate one rate of 81 cents, and on these findings entered the orders complained of.

In the course of the report the Commission declared reasonable the practice of the carriers to make allowance to shippers who, in lieu of switching, dray their cotton from uptown warehouses to shipside, when made on cotton which the carriers are obligated to transport to shipside under transit arrangements, and they denied the contention of the water front' facilities that, if the city delivery and shipside rates are to be equalized, the carriers should be required to discontinue their drayage allowance, or make allowance for handling the cotton from water front warehouses to shipside. They said:

"The respondents (carriers) have asked us to determine whether such allowances may be made at the water front facilities, and if they may be, what they should be. Upon the present record, we see no reason for condemning a reasonable allowance for drayage from uptown facilities under the circumstances recited above, such drayage being a substitute for rail transportation. But such allowances must not be more than reasonable, considering the benefit to respondents (carriers) flowing from such substitute service, and must not be used as a cloak for unlawful preferences to shippers furnishing such substitute service. Not all of the cotton handled by the water front facilities is delivered to shipside at adjacent wharves or piers, and as to such cotton of the character referred to above as is delivered to ships at other wharves or piers, the water front facilities occupy no different position from that of the uptown facilities, and upon such cotton respondents may properly make reasonable drayage allowances under similar circumstances. , This applies equally to barging where barging is used as a substitute for switching. But upon cotton delivered to shipside from and by water front warehouses and compresses over adjacent wharves or piers operated as a part of or in conjunction with such warehouses or compresses, a different condition exists. The hand or electric trucking or movement by overhead trolley from the part of the water front facility known as the warehouse or compress to that part known as the wharf, is not a substitute for rail transportation, but is an intraplant movement, just the same as the handling of cotton from the interior of an uptown warehouse to the railroad car or dray is an intraplant movement. No allowances may lawfully be made for these intraplant movements."

The shippers (plaintiffs in No. 310) and the carriers (plaintiffs in No. 311) are at one in their contention that the Commission was without authority in law and in fact to initi-

ate and fix the rate of 81 cents as they did, because they say the interested parties were not afforded a hearing as to its reasonableness, and because there was no evidence to justify its establishment.

The shipper plaintiffs object to raising the domestic rate to 81 cents, and the carrier plaintiffs object to lowering the export rate to 81 cents.

The shippers, plaintiffs in No. 310, however pitch their main attack upon the primary ground that the order was entered in an attempt to equalize commercial conditions not in fact equal, and that it resulted in a confiscation of their property for the benefit of the interior and uptown warehouses. They say that transportation conditions, the service rendered, and the privileges extended under the export rate in excess of those under the domestic rate justified the difference between the two, and that the Commission did not order the change upon a proper consideration of transportation questions, but merely in order to, and the order had the result of, enabling warehouses not so advantageously situated as plaintiffs' to compete with them; that this was not rate regulation, but confiscation.

They say further that, if the evidence does present proper transportation considerations which would justify an order of the Commission fixing a one-rate plan, no such order was in fact entered, but that the Commission, by directing the allowance by the carrier for substituted service to uptown compresses, and denying it to water front compresses, does not abolish the two-rate plan in favor of the single rate, but in fact establishes a multirate plan, where each facility, except the water front, will pay a rate varying with the cost of the service from its plant to shipside, with the result that the water front compresses, which at great expense have secured their sites, constructed their plants, and arranged for the handling of cotton to shipside, are penalized for their foresight and expenditures through an unjust rate scheme.

They say the Commission has in effect said to the compresses and warehouses at the ports what the mother said to the girl in the old rhyme:

"Mother, may I go out to swim?
    Yes, my darling daughter;
Hang your clothes on a hickory limb
    But don't go near the water."

—and that, if such ruling stands, plaintiffs and those similarly situated had better sell out, move back from the water front, and thus put themselves in a position of equality with their uptown competitors.

As to the fixing of a particular rate, it is conceded that the Commission did not have the power to establish as a rate reasonable and just per se, 81 cents or any other rate, for the question of the reasonableness of the rates per se was not in issue, and the hearing which the law requires for the establishment of such a rate was not afforded.

Plaintiffs in the two cases here say that that is just what the Commission has attempted to do, while the Commission and those in agreement with it with equal vigor declare that the Commission has done no such thing. They say that the rate suggested has been put in at the invitation of the interested parties for the purpose of removing the discrimination and subject to the right of the carrier or shipper, in an appropriate proceeding and manner, to attack its reasonableness, and that that the Commission had full authority to do under the law.

At the hearing on the application for temporary injunction, the court had no difficulty in concluding that the Commission had the power, in the state of the case presented by the record, to find a condition of undue prejudice resulting from the two-rate plan, and that no ground for equitable relief would have been presented if the order of the Commission had gone only that far; in short, that, if the parties had brought into review the order of June 23, 1925, entered in 100 Interst. Com. Com'n R. 159, merely finding discrimination and ordering its removal, the case would have presented no difficulty.

Upon the point presented in No. 311 by the carriers that the fixing of the rate was arbitrary in that it was fixed without a hearing upon and a determination as to its reasonableness and the point presented in the shippers' bill in No. 310 that by reason of that part of the report quoted above, which has to do with allowances for substituted service, the order did not in fact establish a one-rate plan, but undertook to establish a plurality of rates by which those disadvantageously situated within switching limits would be equalized with plaintiffs, the court experienced considerable difficulty in reaching an agreement.

Some of the members of the court saw the matter as the Commission and those on its side see it, that the order merely fixed a rate which entitled a shipper to get his cotton to the port, and that that part of the report which had to do with allowances was collateral to and no part of the order, or, if a part of the order, was a valid exercise of authority, while others were impressed with the contention of plaintiffs that the Commission had

ordered allowances in one case, and disallowances in the other, and that there was grave question whether such an order did not create a condition of preference of the uptown warehouses, by permitting them to get their cotton to the port at the expense of the railroad, while requiring the water front warehouses to pay their own costs.

In short, the court was in agreement that the uptown and the water front facilities should be charged the same rate, in the same switching limits. They were in doubt, however, whether that was the effect of the order.

They have, after the most careful review of the able briefs of counsel, reached the conclusion: That the only question for consideration is the rate established. That, if that rate is the same for all persons in the same territory, that is the end of the matter. That it cannot make any legal difference whether the carrier performs the service continuously, or after a stop for concentration allowed by its tariff, or makes allowance in lieu of, but only in lieu of, transportation, and that, if attention is fixed upon the movement by the carrier, the difficulties of the case will disappear. That they arise out of, and only out of, a consideration of allowance in lieu of transportation. That this confusion can and should be avoided by disassociating the rate from the allowances, and considering each upon its merits. That it is time enough for a shipper to complain of an allowance or disallowance when there has been an order on it, and that the present contention is purely academic and speculative. They believe: That, if the water front warehouses can have cotton delivered to their own plant facilities by which they can put the cotton to shipside, it is no concern of theirs that an uptown warehouse gets its cotton to shipside at the same transportation cost. That the fact that the water front warehouses have spent money to get their sites, and made expenditures upon intraplant equipment is no matter to be considered in rates. That they are entitled to as good a rate as others situated in the same limits, but that there is no reason why they should have better rates. In short, that they have contributed nothing to transportation as such in building where they did and in equipping their plants as they have, and that, for what they have furnished other than transportation service, they cannot in law recover.

And finally the court is in agreement that whatever the order of the Commission ought to be in a specific instance upon a specific claim for allowance or disallowance, or whatever relief might be obtained against such

order, the report of the Commission is so delivered and the order on it so entered as that there is no matter now presented for injunctive relief. Procter & Gamble v. U. S., 225 U. S. 282, 32 S. Ct. 761, 56 L. Ed. 1091; Manufacturers' Railway v. U. S., 246 U. S. 457, 38 S. Ct. 383, 62 L. Ed. 831; U. S. v. Los Angeles & S. L. R. Co., 273 U. S. 299, 47 S. Ct. 413, 71 L. Ed. 651.

Upon the other point asserted by both carrier and shipper, viz., that they are entitled to relief as against the naming of 81 cents as the rate to be adopted in order to remove the discrimination found (1) because · the Commission cannot initiate a rate without a determination of its reasonableness per se, and (2) because, if the Commission has the power to do so, there is no evidence here to justify its finding, we have reached the conclusion that plaintiffs are wrong on both points, though not without, at least on the part of the writer, considerable difficulty.

It is conceded on all sides that the proceeding before the Commission was not designed to, and that the Commission did not attempt to, fix the rate of 81 cents as a just and reasonable rate per se.

The carrier and shipper plaintiffs assert that the Commission has no power to fix a rate unless its reasonableness per se is determined. The Commission, and those on its side, declare that where, as in this case, a rate is selected between two rates, both of which have been declared to be within the zone of reasonableness, the finding of the Commission establishing such rate required only evidence that it was a just and reasonable rate to effect removal of the discrimination, and not that it was just and reasonable per se, citing U. S. v. Illinois Central Railroad, 263 U. S. 515, 44 S. Ct. 189, 68 L. Ed. 417; Swift Lumber Co. v. Fernwood & Gulf R., 61 Interst. Com. Com'n R. 485; Arkansas Jobbers Ass'n v. Dir. Gen., 59 Interst. Com. Com'n R. 662; Ridenour-Baker Mer. Co. v. A., T. & S. F., 113 Interst. Com. Com'n R. 629.

In addition to these cases, the Commission cites as analogous decisions of the Commission and of the court on Interstate Commerce Act, § 13, par. 4 (49 USCA § 13; Comp. St. § 8581).

The difference between. the section there discussed and section 15 (49 USCA § 15; Comp. St. § 8583), under which the action here was taken, is apparent. There the requirement is merely. that the Commission shall prescribe the rate, fare, or charge to be observed in such manner as in its judgment will remove preferences, whereas here, where a discrimination is found, the act provides:

"The Commission is hereby. authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare or charge, or rates, fares or charges to be thereafter observed in such cases, and * * * what individual or joint classification, regulation or practice is or will be *just, fair and reasonable* to be thereafter followed."

And it is my opinion that the decisions construing section 13 throw little light on the section at bar.

The court is convinced that, while under section 3 (49 USCA § 3; Comp. St. § 8565) under which this proceeding was taken, it was competent for the Commission to not only forbid the discrimination, if there was one, but to fix a rate which it found to be just, fair, and reasonable which would do away with the practice condemned, it is essential to the fixing of such a rate that a hearing be had and a finding made upon its reasonableness.

The full court is, however, of the opinion that a fair construction of the words "just and reasonable," as used in the context above quoted, permits the conclusion that, in a discrimination case under section 3 such as this is, it is only necessary ·that the rate fixed upon to remove the discrimination be found to be just and reasonable for that purpose, and that it is not necessary that it be found just and reasonable per se.

So believing, we overrule the first contention of plaintiffs, that the Commission is without power in this kind of proceeding to fix as ·just and reasonable for the purpose of removing a discrimination, a rate which has not been found to be just and reasonable per se.

We are further of the opinion that, in view of the proceedings before the Commission, in which all parties participated under an order stating as one of the purposes of the hearing the arriving at a rate which would remove the discrimination found, petitioners having participated in that hearing without objection or contest, and the carrier plaintiffs having in fact invoked the Commission's aid upon the point, are in no position now to seek injunctive relief against the named rate, but should, if the rate is deemed not just and reasonable per se, pursue their remedy before the Commission in appropriate proceedings available to them for that purpose.

Since we find upon the second point that, while there is no evidence to support a find-

ing, nor did the Commission attempt to find, that the rates were just and reasonable per se, there is ample evidence to support a finding that, under the practice prevailing as to shipments to the ports, a rate of 81 cents would be a just and reasonable rate to remove the discrimination existing under the two-rate plan, it follows, from what we have said, that no ground for injunctive relief exists, that the temporary injunction heretofore issued should be recalled, and that the bill should be dismissed for want of equity.