PENNSYLVANIA R. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

Civil Action No. 2091.

District Court, D. Maryland.

March 2, 1944.

originating at points in States included in what is commonly known as Central Territory (defined generally as that territory lying north of the Ohio River, south of the Great Lakes, east of Chicago, St. Louis and Cairo, Illinois, and west of Buffalo and Pittsburgh), and carried to Hagerstown, Maryland. There, the grain and grain products are allowed to be held over under what is known as a transit privilege, for the purpose of being manufactured into live stock and poultry feed, and then the manufactured product is reshipped to destinations on the lines of the Pennsylvania Railroad east of York, Pennsylvania, and Fulton Junction (Baltimore), and between New York City and Cape Charles, Virginia, inclusive, and more particularly to destination points in Delaware, Maryland and Virginia between the Chesapeake and Delaware Bays, some times called the Del-Mar-Va Peninsula. The Pennsylvania Railroad is the only carrier serving these latter points. The so-called transit privilege allowed at Hagerstown rests, like other transit privileges such as creosoting lumber or fabricating iron and steel, upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination.

Thirteen carriers affected by this order are the petitioners in the present suit. The defendant is the United States, and interveners-defendants are the Interstate Commerce Commission and D. A. Stickell & Sons, Inc., a Maryland corporation engaged in the milling and mixing of grain, grain products and grain by-products, and in the manufacture of mixed live stock and poultry feed at Hagerstown, Maryland, this company being the original petitioner before the Interstate Commerce Commission on whose complaint the Commission's order here under review was passed.

Independently of the Commission's order, there are, and have been for some time, joint rates in effect on grain and grain products with the so-called transit or mixing privilege at Hagerstown, Maryland, and other points, applicable from points of origin in Central Territory, to all points in so-called Trunk Line Territory, which is generally defined as that territory east of Central Territory and west of New England, New York City and Norfolk, Virginia. However, these existing joint rates are restricted by the carriers so that they

William Pepper Constable and Francis R. Cross, both of Baltimore, Md., and Joseph F. Eshelman, of Philadelphia, Pa., for petitioners.

Edward M. Reidy, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., Robert L. Pierce, Sp. Asst. to Atty. Gen., C. R. Hillyer, of Chicago, Ill., and Charles F. Wagaman and John Wagaman, both of Hagerstown, Md., for interveners-defendants.

Before SOPER, Circuit Judge, and COLEMAN and CHESNUT, District Judges.

COLEMAN, District Judge.

This suit is instituted under Section 17 (9) of the Interstate Commerce Act, 49 U.S.C.A. § 17(9), and the provisions of the Act of Congress of October 22, 1913, c. 32, 38 Stat. 219, 28 U.S.C.A. §§ 41 (28), 43–48, to enjoin the operation and effect of an order of the Interstate Commerce Commission.

This order requires the establishment of certain additional through routes and joint rates and charges applicable thereto, on shipments of grain and grain products,

apply only over certain through routes. For example, they do not apply on traffic originating in Central Territory or west thereof, if destined to points on the Pennsylvania Railroad, unless that carrier receives the traffic at or west of Pittsburgh or Buffalo. A similar situation exists with respect to traffic moving over the Baltimore & Ohio Railroad. As a result, these existing through routes of the latter road and of the Pennsylvania, through Hagerstown, embrace out-of-line hauls of 48 and 149 miles, respectively. The Pennsylvania's out-of-line haul is from its Enola Yard, a point on the Susquehanna River opposite Harrisburg, to Hagerstown and return, for which out-of-line or back-haul operation, the Pennsylvania charges, in addition to the joint through rate with the transit privilege at Hagerstown (which is 26½¢ per 100 pounds from Chicago to Salisbury, Maryland), 4.5¢ per 100 pounds, or 90¢ a ton. It will thus be seen that this additional charge is approximately 17% of the through rate.

The Stickell Company does not contest the reasonableness per se of this back-haul charge or of the joint rates, but claims that this extra charge almost completely destroys its margin of profit on the sale of its products. However, Stickell's basic claim is for better transportation service, on the ground that the existing route via Hagerstown over the Pennsylvania as just described, being indirect with an out-of-line back-haul, is inadequate, inefficient and uneconomical, and results in its shipments being unduly delayed in reaching customer consignees, thus placing it at a disadvantage as respects its competitors not located in Hagerstown but who buy their grain and grain products from the same general territory, and ship to the same markets.

Taking Chicago as a respresentative point of origin and Salisbury, Maryland, as a representative destination point, one of the new routes to and through Hagerstown, Maryland, ordered by the Commission and designated as route 1, embraces the use of the New York Central to Youngstown, Ohio; the Pittsburgh & Lake Erie from there to Connellsville, Pennsylvania; thence by the Western Maryland to York, Pennsylvania where the Pennsylvania finally receives the traffic and hauls it to destination. Similarly, new route 2 ordered by the Commission, embraces the use of the Wabash to Toledo, Ohio, the Wheeling & Lake Erie to Pittsburgh Junction, Ohio,

the Pittsburgh & West Virginia to Connellsville, Pennsylvania, and thereafter the haul being the same as by new route 1 ordered by the Commission. However, such routes short-haul the Pennsylvania, that is to say, require it to embrace in such routes substantially less than the entire length of its lines between the termini of such routes. For example, again using Chicago as a representative origin point and Salisbury, Maryland, as a representative destination point, the distance over the direct route of the Pennsylvania alone, is 902 miles, whereas if the Pennsylvania is required to put into effect the new routes ordered by the Commission whereby it would participate in the traffic only from Fulton Junction, Baltimore, or York, Pennsylvania, its haul would be only 155 miles and 114 miles, respectively, or a reduction of 747 and 788 miles, respectively. This, the Pennsylvania contends, the Commission cannot lawfully require it to do without its consent.

No testimony was taken before this Court, the case being presented on the record of the proceedings before the Interstate Commerce Commission.

Under the provisions of Section 15(3) of the Interstate Commerce Act, 49 U.S.C.A. § 15(3), the Interstate Commerce Commission "may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes, joint classifications, and joint rates, fares, or charges * * *." Section 15(4) of the Act, as amended by the Transportation Act of 1940, 49 U.S.C.A. § 15(4), imposes limitations upon this power of the Commission, as follows: "In establishing any such through route the Commission shall not (except as provided in section 3 [not involved here], and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) *unless the Commission finds that the through route proposed to be*

*established is needed in order to provide adequate, and more efficient or more economic, transportation:* Provided, however, That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. In time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission, it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest." (Italics inserted.)

Relying upon clause (b) of Section 15 (4) of the Act, just quoted, Stickell, in 1941, filed a complaint with the Commission against a large number of railroads, seeking the establishment of the two additional through routes and joint rates and charges applicable thereto, which we have just described. After due hearing, at which testimony was taken before an examiner of the Commission, he recommended that the relief sought be granted. The matter came on for argument before Division 2 of the Commission, and on March 18, 1943, that Division rendered its decision, ordering the establishment of the new through routes. D. A. Stickell & Sons, Inc., v. Alton Railroad Co., 255 I.C.C. 333. Thereupon, the carriers, pursuant to their statutory right, petitioned the entire Commission to review the decision of Division 2, but the Commission, by order of October 4, 1943, denied, without report, the petition for reargument and reconsideration, although by interim and subsequent orders, it modified its order of March 18, 1943, so as to become effective on March 17, 1944, upon thirty days notice. This effective date has been further extended by the Commission, in view of this pending proceeding, to April 17, 1944. As a result of this action, the carriers involved are required to file with the Commission, not later than March 17, 1944, tariffs establishing the joint rates over the prescribed new through routes, to become effective not later than April 17, 1944, unless the Commission's order is suspended and annulled by this Court. If such is not done, and petitioners fail to obey the Commission, they would be subject to a penalty of $5,000 for each day each violation thereof continues (49 U.S.C.A. § 16(8).

The following passages taken from its report embrace the Commission's reasons for its action (255 I.C.C. 341-344):

"It is the duty of carriers to afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines. That requirement of section 3(4) by necessary implication means that such interchange facilities must be adequate to handle all traffic that may reasonably be expected to require interchange at such points. It is no defense to a complaint seeking through routes necessary and desirable in the public interest to show that a carrier has failed to perform its duty to establish such facilities and that by reason of that neglect of duty it is more convenient from an operating standpoint for it to haul traffic 149 miles out of line.

\* \* \* \* \*

"Prior to the amendment of section 15 (4), the Commission's power to prescribe through, all-rail, routes which would short haul any carrier participating therein without its consent was limited to instances where the inclusion of the entire length of its railroad between the termini of such route would make the through route unreasonably long as compared with another practicable route which could otherwise be established. While that section limited the powers of the Commission, it left it entirely within the discretion of the carrier as to whether it would insist upon its long haul. It was at liberty to voluntarily join in any route which it believed to be more adequate, efficient and economical than a route embracing its entire line, although the latter route might not be unreasonably long. Therefore, no exception to the restriction on the Commission's power was necessary to protect carriers' interests.

"As to the shippers, however, a different situation existed. It rests within the power of carriers by insistence on their long hauls to place localities and shippers on the lines of other carriers or not on their direct lines at severe rate and competitive disadvantages and, as in the instant case, to deprive shippers of relatively equal op-

385

portunities to compete in markets served only by them. Carriers in many instances availed themselves of the right to their long haul, and the disadvantaged localities and shippers had no redress. It was to remedy that situation, apparently, that the second exception was added. The Commission was thereby given authority, when it finds that through routes are 'needed in order to provide adequate and more efficient or adequate and more economic transportation,' to require the establishment of such routes although they may short haul one or more of the participating carriers. We interpret that exception to mean adequate and more efficient and more economic from the public's or shippers' as well as the participating carriers' standpoint. That such was the intent of the Congress is evident from the conditions the amendment was apparently designed to correct, from the fact that in the added proviso even the preference to be accorded the originating carrier is made subservient to the public interest, from both limitations on the right of a carrier to retain its long haul, and from the fact that the Congress specifically provided that, as between carriers, 'No through route or joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs.'

"That the present route is not as adequate and efficient as the routes sought, so far as the shipper is concerned, is evidenced by the fact that, in order to meet the demands of customers for prompt delivery, complainant shipped 640 cars from Hagerstown over the Western Maryland and the Reading to Elsmere Junction thence by truck to points on the Del-Mar-Va Peninsula. The fact that the proposed routes would be more economical to the shipper is shown by the fact that the saving in transportation charges would be 4.5 cents per 100 pounds on all grain and grain products moving over those routes and transited at Hagerstown, as compared with the charges over routes of the Pennsylvania via Enola yard heretofore described.

"We find that the two routes sought are necessary and desirable in the public interest and that they are needed to provide adequate and more efficient and adequate and more economical transportation and should be established, subject to the lowest through rates contemporaneously maintained on the same commodities from the same origin to the same destinations over the direct routes of the Pennsylvania, or over routes in which the Pennsylvania is a participating carrier via Enola yard near Harrisburg."

All parties to the present proceeding concede that clause (a) of Section 15(4) is not involved, because the existing direct routes are shorter than the proposed routes and the Commission so found. For example, the distance from Chicago to Salisbury, Maryland, over the direct route of the Pennsylvania is 902 miles, whereas over new route 1 ordered by the Commission, the distance is 946 miles via Fulton Junction (Baltimore), and via York, 958 miles; and over route 2, via Fulton Junction (Baltimore), 938 miles, and via York, 950 miles.

It will thus be seen that two basic questions are presented for decision: First, what is the precise character of the restriction which clause (b) of Section 15 (4) of the Act places upon the Commission's power to order the establishment of new through routes which short-haul a railroad without its consent; and second, has the Commission, in the present case, exceeded the authority granted it by clause (b)?

The Meaning of Clause (b) of Section 15 (4) of the Act.

With respect to the interpretation to be given to clause (b) which has not heretofore been construed in any reported court decision, the gist of the carriers' contention is that the Commission is restricted in prescribing through routes to cases where the need is proven for "adequate, and more efficient or more economic" *physical* facilities, instrumentalities and services. That is to say, the carriers contend that the meaning of clause (b) is to make the short-hauling restriction embodied in the initial clauses of Section 15(4) inapplicable only where existing routes do not provide "adequate, and more efficient or more economic, transportation" in the *operating* sense, that is, as the word "transportation" is defined in Section 1(3)(a) of the Interstate Commerce Act, 49 U.S.C.A. § 1 (3)(a), which is as follows: "The term 'transportation' as used in this part shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt,

delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." The carriers contend that the existing through route is not only entirely adequate but is also more efficient and more economic when tested by an operations' criterion.

On the other hand, the shipper and the Commission contend that the only reasonable interpretation of the exception in clause (b) is that it means, as the Commission held in its opinion, "adequate and more efficient and more economic from the public's or shippers' as well as the participating carriers' standpoint." In other words, the shipper and the Commission assert that the switching and terminal services at Harrisburg in breaking up through trains from the west, and in diverting shipments for the back-haul of 148 miles to the Pennsylvania's branch line to Hagerstown which runs southwest from Harrisburg, when the ultimate destination of shipments are points east of Harrisburg; that repetition of the same operations when the shipments are returned from Hagerstown to Harrisburg and are there stopped and switched into eastbound trains for movement to destination; and that also the additional delays and terminal services incident to switching cars from the Pennsylvania to the Western Maryland tracks at Hagerstown, and from the Western Maryland back to the Pennsylvania tracks for the movement north from Hagerstown to Harrisburg, are all factors which the Commission was permitted to take into account in determining whether the new through routes prescribed were "needed in order to provide adequate, and more efficient or more economic, transportation."

In order to determine the true meaning of clause (b) and, therefore, the precise extent of the Commission's power under this clause, it is necessary to review its legislative history. The original Act to Regulate Commerce approved February 4, 1887, 24 Stat. L. 379, 384, gave to the Interstate Commerce Commission no authority to prescribe through routes and joint rates, that power being first conferred by an amendment to Section 15 of the original Act embraced in the Hepburn Act of June 29, 1906, 34 Stat. L. 584, 590, but this power was limited in that it could only be exercised in case "no reasonable or satisfactory through route exists." By the Mann-Elkins Act of June 18, 1910, 36

Stat. L. 539, 552, this limitation was eliminated, but the first so-called short-haul restriction on the Commission's power was enacted as follows: "and in establishing such through route, the commission shall not require any company, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith which lies between the termini of such proposed through route, unless to do so would make such through route unreasonably long as compared with another practicable through route which could otherwise be established." By the Transportation Act of 1920, 41 Stat. L. 456, 485, 486, this provision, as well as the general provision for the establishment of through routes and joint rates, was changed, the short-hauling restriction provision being enacted to read as follows (Section 15(4): "In establishing any such through route the Commission shall not * * * require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established: Provided, That in time of shortage of equipment, congestion of traffic, or other emergency declared by the Commission it may * * * establish temporarily such through routes as in its opinion are necessary or desirable in the public interest."

Following the legislation of 1920, the Commission had numerous occasions to construe clause (4) of Section 15 until the year 1929 and it had frequently, but not uniformly, interpreted that provision as protective only of the originating carrier or of a subsequent carrier only after it had obtained possession of the traffic. See, for example, Waverly Oil Works Co. v. Pennsylvania R. Co., 1913, 28 I.C.C. 621, 630, 631; Flory Milling Co. v. Central N. E. Ry. Co., 1924, 93 I.C.C. 129, 134; Fort Smith, S. & R. I. R. Co. v. Alabama & V. Ry. Co., 1926, 107 I.C.C. 523: Routing of Grain, 1928, 147 I.C.C. 782, 784. However, in 1929, the Supreme Court was called upon to construe clause (4) of Section 15 in United States v. Missouri Pacific

R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322, commonly known as the Subiaco case, the complaint having been initiated by the Fort Smith, Subiaco & Rock Island R. R. Co. against The Missouri Pacific R. R. Co., and a large number of other rail carriers. The Commission made an order establishing through routes for westbound traffic over the Subiaco. The Missouri Pacific sued to set aside the order, and a District Court, composed of three judges, held that the Commission was without power to establish the routes. 21 F.2d 351. The United States, the Commission and the Subiaco appealed and the lower court was affirmed, the Supreme Court holding that the protection granted by Section 15(4) against short-hauling was not limited to the originating carrier or to a subsequent carrier getting possession of the traffic, but that it operated as a restriction upon the Commission's right to prescribe through routes which would short-haul *any* of the participating carriers.

Prior to this decision, there was pending before the Commission a proceeding instituted by Stickell & Sons, the same shipper that is complainant in the present case, for the establishment of additional through routes and joint rates on grain and grain products via Hagerstown, subject to transit privileges at that point, similar to those required by the Commission's present order here under review. In 1928, in D. A. Stickell & Sons v. Western Maryland Railway Co., 146 I.C.C. 609, the Commission found the establishment of these through routes and joint rates desirable in the public interest. A futher hearing, however, was ordered in that case, but before the Commission made its final report, the Supreme Court rendered its decision in the Subiaco case, supra. Thereupon, the Commission, in a second report (153 I.C.C. 759), held that protection of the long hauls of the carriers involved was not shown to result in routes unreasonably long in comparison with those which complainant sought, and therefore the Commission found that it was without power to require the establishment of additional through routes.

Following this decision, the Commission, in several of its annual reports to Congress, urged an amendment which would overcome this decision, and various bills were introduced in Congress for this purpose. However, no change was made in Section 15(4) until the passage in 1940 of the Transportation Act, when the law as it now stands was enacted, embracing clause (b) which we have heretofore quoted and which is the provision here in issue.

So much for the evolution of the clause which we are called upon to interpret. This summary of the various legislative enactments which finally resulted in its adoption may be said still to leave some doubt as to the precise intent that lay behind the adoption by Congress of the phraseology of clause (b). In other words, a mere chronology of the various legislative steps fails to explain just how far Congress intended the Commission might go in invoking clause (b). However, reports of Congressional committees and explanatory statements made by their members in presenting a bill for passage are legitimate aids to the interpretation of a statute if there is any doubt as to the intended meaning of the language employed. Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas. 1915A, 315; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Railroad Commission of State of Wisconsin v. Chicago B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086; United States v. Missouri Pacific Railway Co., supra. See also, Helvering v. Griffiths, 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843. Therefore, it is appropriate for us to resort to such interpretative aids in the present case.

First, it is appropriate to note, because not disputed, that the Commission requested of Congress complete authority to fix through routes and joint rates with no limitation other than that there must be proven need for same *in the public interest*. But Congress ultimately refused to go this far. In the bill which finally became the Transportation Act of 1940, 54 Stat. L. 898, and bore Senate number 2009 as first passed by the Senate (76th Cong. 1st Sess.), the short-haul restriction had been entirely eliminated from Section 15(4). The House amended the bill and reinserted Section 15(4). Thereupon, clause (b) was written into the bill by the Conference Committee on the disagreeing votes of the two Houses, in the form in which it was finally enacted. The report of the Conference Committee as submitted to the House contains an explanatory statement by Mr. Lea concerning the short-haul provision in which is to be found the following

388

(H.R. Report, No. 2832, 76th Congress, 1st Sess. pp. 70, 71): "The House amendment made no change in the short-haul provision of section 15(4) and the exceptions thereto. The Conference substitute in section 10(b) retains them and includes another exception by providing that the restriction against short-hauling a rail carrier shall not apply where the Commission finds that the through route proposed to be established is needed in order to provide adequate and more efficient or more economic transportation. The Commission, in the exercise of this additional authority, is directed to give reasonable preference in any particular case to the carrier by railroad which originates the traffic, so far as is consistent with the public interest and subject to the limitations with respect to unreasonably long routes and the necessity of providing adequate and more efficient or more economic transportation. The Commission is prohibited from establishing any through route and joint rates applicable thereto for the purpose of assisting any carrier that would participate therein to meet its financial needs."

■ There is little to be derived from other Committee reports which throws any further light upon just what meaning Congress intended to attach to the use of the words "adequate, and more efficient or more economic, transportation." The carriers' brief is replete with extensive quotations of statements made by railroad witnesses at hearings which were held before various Congressional committees in connection with a number of independent through route bills which, however, were never enacted. The carriers stress the fact that these witnesses used the words "efficient" and "economic" from a railroad operating standpoint. However, conceding that they did, and apart from any question as to our right to resort to such statements as an aid in interpreting the meaning of a statute (in Helvering v. Griffiths, supra the Supreme Court would appear to indicate contrary to its earlier decisions, that *any* statement or debate made in Congress relative to a particular bill may be resorted to as an interpretative aid in case of doubt as to its meaning as enacted), we conclude that, with the legislative history and background which we have just reviewed, the better view is that the words employed in clause (b) clearly indicate that Congress must have intended the broad meaning which the Commission has given to these words, rather than the restricted meaning upon which the carriers are insisting.

For example, one of the prerequisites of clause (b) before the new through route may be established is that it is needed in order to provide "adequate transportation". Obviously, Congress could not have been referring to the carriers by employing these words because it would be meaningless to speak of a railroad itself needing "adequate transportation". On the other hand, it is a truism to say that the shipping public may have need for such. It is true the adjective "adequate" does not stand alone but is coupled with the adjectives "efficient" and "economic", and these adjectives, of course, must reasonably be construed as referring either to the services received by the shipper or to operations from the railroad standpoint, or to both. Since all three adjectives employed qualify the same noun, "transportation", and since, as we have seen, it would not be sensible to say that the noun when qualified by the first of these adjectives was intended to relate to something which the carrier, as opposed to the shipper, needed, it is, therefore, entirely reasonable to say that the other two adjectives must be taken as having been employed for the purpose of qualifying the same noun when used in the latter sense, but also when used in an operating sense because their qualifying of the noun "transportation," unlike the adjective "adequate", is just as meaningful with reference to carriers' as to shippers' needs.

Language somewhat similar to that under discussion is to be found in Section 15a (2) of the Interstate Commerce Act, as amended by the Act of June 16, 1933, 48 Stat. 220, as follows: "In the exercise of its power to prescribe just and reasonable rates the Commission *shall give due consideration,* among other factors, * * * *to the need, in the public interest, of adequate and efficient railway transportation service* at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service." (Italics inserted.) Also, in the further amendment of this Section by the Transportation Act of 1940, 49 U.S.C.A. § 15a (2), we find the identical language. It will thus be seen that the phraseology now before us is in effect merely an abbreviation of the phraseology which Con-

gress had previously employed in another part of the Interstate Commerce Act as early as 1933. There can be no doubt as to the meaning of the language then and there employed, because it is plain and unambiguous to the effect that the needs of both the shipping public and the carriers must be safeguarded. Thus, it is only logical to say that when Congress employed similar but somewhat abbreviated language in Section 15(4)(b), it did so with the same purpose in mind.

Support for this view is found in decisions of the Supreme Court construing the term "public interest" in the Transportation Act of 1920, the Emergency Railroad Transportation Act of 1933, and the Transportation Act of 1940. For example, in New York Central Securities Corp. v. United States, 287 U.S. 12, pages 24, 25, 53 S.Ct. 45, page 48, 77 L.Ed. 138, in referring to the criterion, "public interest", as used in Section 5 of the Interstate Commerce Act, as amended by the Transportation Act of 1920, 49 U.S.C.A. § 5, whereby consolidations of carriers were permitted when the Commission found them to be in the "public interest", the Court said: "Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is that 'public interest.' It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. Going forward from a policy mainly directed to the prevention of abuses, particularly those arising from excessive or discriminatory rates, Transportation Act, 1920, * * * was designed better *to assure adequacy in transportation service* * * *. The provisions now before us were among the additions made by Transportation Act, 1920, and the term 'public interest' as thus used is not a concept without ascertainable criteria, but *has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency,* and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred." (Italics inserted.)

This language has been adopted and quoted in several later decisions of the Supreme Court, relating to carrier consolidations. For example, we find re-affirmance of it in State of Texas v. United States, 292 U.S. 522, 531, 54 S.Ct. 819, 78 L.Ed. 1402; in United States v. Lowden, 308 U.S. 225, 230, 60 S.Ct. 248, 84 L.Ed. 208, and again, in a very recent decision, McLean Trucking Co. v. United States, 64 S.Ct. 370, page 377, where the following is said: "The national transportation policy is the product of a long history of trial and error by Congress in attempting to regulate the nation's transportation facilities beginning with the Interstate Commerce Act of 1887. For present purposes it is not necessary to trace the history of those attempts in detail other than to note that the Transportation Act of 1920 marked a sharp change in the policies and objectives embodied in those efforts. Theretofore, the effort of Congress had been directed mainly to the prevention abuses; particularly those arising from excessive or discriminatory rates'; and emphasis on the preservation of free competition among carriers was part of that effort. The Act of 1920 added 'a new and important object to previous interstate commerce legislation.' It sought 'affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country.' Dayton-Goose Creek R. Co. v. United States, 263 U.S. 456, 478, 44 S.Ct. 169, 68 L.Ed. 388, 33 A.L.R. 472; Texas & P. R. Co. v. Gulf C. & S. F. R. Co., 270 U.S. 266, 277, 46 S.Ct. 263, 70 L.Ed. 578. And in administering it, the Commission was to be guided primarily by consideration for 'adequacy of transportation service, * * * its essential conditions of economy and efficiency, and * * * appropriate provision and best use of transportation facilities * * *.' New York Central Securities Corp. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 77 L.Ed. 138."

It is to be noted that Section 15(3), upon which Section 15(4) of the Act is a limitation, employs the term "public interest". Thus, although Congress did not add the word "service" after the word "transportation" in clause (b) of Section 15(4), as the Supreme Court did when referring to adequate, economic and efficient transportation in New York Central Securities Corp. v. United States, and the later decisions, supra, adopting the same view, it is only reasonable to assume that Congress meant the same thing. If further support be needed for this conclusion, we

feel that it is to be found in the declaration of a national transportation policy as defined in the Transportation Act of 1940, 49 U.S.C.A. note preceding section 301, which asserts that: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; *to promote safe, adequate, economical, and efficient service* and foster sound economic conditions in transportation and among the several carriers \* \* \*." (Italics inserted.)

We find nothing inconsistent with the aforegoing in the definition of the term "transportation" as explained in Section 1(3) (a) of the Act, 49 U.S.C.A. § 1(3) (a), which we have heretofore quoted, and upon which the carriers place much reliance, because this definition is one of expansion, of inclusion rather than of limitation; and furthermore, while it is true that it embraces "instrumentalities and facilities of shipment or carriage", it equally embraces "all services" in connection with the receipt, transportation, delivery and handling in any form of shipments consigned to carriers. In short, it would be absurd to say that this use of the word "services" is not confirmatory of the basic policy to safeguard the shippers' interests.

It is to be noted that Section 15(4), in the proviso immediately following clause (b), recites "that in prescribing through routes the Commission shall, *so far as is consistent with the public interest,* and subject to the foregoing limitations of clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic." (Italics inserted.) So the Commission cannot preserve the long-haul even to the originating carrier if such would be contrary to the public interest, namely, in such case, the shipping public. The carriers contend that if the Commission's interpretation of clause (b) is allowed to stand, a carrier may be short-hauled every time a shipper can show that it will be cheaper or more efficient from his standpoint alone, if that is done. This is not our view. Under the construction which we give to clause (b), even if the shipper is able to prove that the proposed new route would give him more efficient or more economic transportation—better (as for example quicker) or cheaper ser-

vice—since, by the express language of paragraph (3) of Section 15, the Commission may never establish a through route unless "deemed by it to be necessary or desirable in the public interest", we have no doubt but that this language, fairly interpreted, must be taken to include also considerations of railroad operating efficiency and economy, which, in a given case, may control over considerations in the shipper's favor.

■ Finally, we feel we scarcely need say more to make it clear that the Transportation Act of 1940 is very broad, remedial legislation. For this reason, as the Supreme Court has said about the Transportation Act of 1920, it should "be given a liberal interpretation; but for the same reason exemptions from its sweep should be narrowed and limited to effect the remedy intended." Piedmont & Northern Railway Co. v. Interstate Commerce Commission, 286 U.S. 299, 311, 312, 52 S.Ct. 541, 545, 76 L.Ed. 1115. See also McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164; Gregg Cartage Co. v. United States, 316 U.S. 74, 83, 62 S.Ct. 932, 86 L.Ed. 1283.

To summarize our conclusions as to the precise character of the restriction which clause (b) of Section 15(4) of the Act imposes upon the Commission's power to order the establishment of new through routes which short-haul a railroad without its consent, we are of the opinion that the exception embodied in that clause must be interpreted to mean "adequate, and more efficient or more economic, transportation" from the shipper's as well as from the carrier's standpoint, and that, therefore, the Commission has authority under this clause, to consider and weigh the relative importance of all factors affecting both shipper and the carrier.

Having thus interpreted clause (b) of Section 15(4), we now turn to a consideration of the question whether the Commission, in the present case, has, as the carriers contend, exceeded the authority granted it by this clause.

### The Commission's Findings.

The principal findings of fact made by the Commission may be summarized as follows: The margin of profit of Stickell's products is small. The two principal items involved in the prices at which these products are sold are the amounts paid for the ingredients and freight charges. Feed

manufacturers at the rate-break points, and at Buffalo, New York; Fort Wayne and Indianapolis, Indiana; Cincinnati, Toledo, Cleveland and Akron, Ohio; and Pittsburgh, Lancaster and York, Pennsylvania, can reach the markets in Delaware, Maryland and Virginia, between the Chesapeake and Delaware Bays, in competition with Stickell, at the same through rates as Stickell. However, Stickell, on grain purchased at these points of origin when the Pennsylvania receives the traffic at or west of Pittsburgh or Buffalo, must pay 90¢ a ton more, or, when other carriers perform the in-bound haul, then must pay combination rates. The new through rates in controversy are well established up to Hagerstown and are generally accepted as reasonable by both shippers and carriers to points in eastern territory. There is no proof that those routes would be less economical as parts of the entire new through routes to destinations in question on the Pennsylvania, than to destinations on the other carriers' lines in eastern territory. On the contrary, the new routes would not result in any cross-haul but would eliminate an out-of-line haul of 149 miles and two switching interchanges at Hagerstown, and would relieve the Pennsylvania of the expense of maintaining the transit privilege or service, and of absorbing the switching charges at Hagerstown, where the Western Maryland would bear all transit and switching expense.

The Pennsylvania interchanges traffic with the Western Maryland at York and Fulton Junction (the junction points that would be utilized under the new through routes) once every twenty-four hours; and while the interchange tracks at those junction points are now used to near, and some times to full capacity, operating conditions there are no more difficult than operating conditions now encountered at Hagerstown.

One day is required for transportation each way between Harrisburg and Hagerstown, and one day for each interchange, between the Western Maryland and the Pennsylvania at Hagerstown, or a total of four days consumed in the out-of-line haul, and on the average, an additional three to four days is required for the movement of a car from Stickell's plant to destination points in Delaware, Maryland and Virginia; whereas, based on the fact that the out-of-line and interchange service at Hagerstown would be eliminated, and on

the fact that a car leaving Hagerstown via the Western Maryland late in the morning, arrives at Elsmere Junction (Wilmington, Delaware) on the Reading, the next morning, Stickell's estimate that there would be saved two days in reaching these destination points over the new through routes, is to be accepted as correct, because there is no categorical denial of same by the Pennsylvania, supported by concrete statistical data.

The Commission relied upon a further finding that in order to meet the demands of customers for prompt delivery, complainants had shipped 640 cars of its products from Hagerstown over the Western Maryland and the Reading to Elsmere Junction, thence by truck to points on the Delaware, Maryland, Virginia Peninsula.

■ We are fully satisfied, after an examination of the record before the Commission, that it contains ample, substantial evidence to support all of the findings of fact made by the Commission which we have just summarized, and that being the case, we are equally satisfied that these facts amply support the Commission's ultimate finding (255 I.C.C. 333, at page 344) "that the two routes sought are necessary and desirable in the public interest and that they are needed to provide adequate and more efficient and adequate and more economical transportation," within the meaning which we have found in the earlier part of this opinion must be given to clause (b) of Section 15(4).

■ This Court may not disturb findings of fact made by the Commission unless it has acted arbitrarily or without substantial evidence to support its conclusions, or has transcended its Constitutional or statutory powers. Interstate Commerce Commission v. Delaware, L. & W. Rwy. Co., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448; Procter & Gamble Co v. United States, 225 U.S. 282, 32 S.Ct. 761, 56 L.Ed. 1091; United States v. Louisville & Nashville R. Co., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245; Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999; Baltimore & O. R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209; Purcell v. United States, 315 U.S. 381, 62 S.Ct. 709, 86 L.Ed. 910; Interstate Commerce Commission v. Hoboken Mfgrs. R. R. Co., 64 S.Ct. 159. In other words, the credibility of witnesses and the weight of the evidence are matters for the Commission and not for the courts to determine,

392

and the Commission's findings in these respects cannot be reviewed by the courts if supported by substantial evidence.

Of course, the Commission would clearly not be justified in attempting to neutralize the disadvantage of geographical location such as Stickell has, by requiring of a carrier wasteful or additional service, without adequate compensation, even though Stickell might, for competitive or other business reasons, be in dire need thereof. But, there is an absence of any convincing evidence in the present case that through the establishment of the new through routes, the Pennsylvania would not be adequately compensated or that its facilities or services which it owes to other shippers generally would be interfered with. The rates are to be the same for the new routes as for the existing ones. It is significant also, that Stickell's plant is not located upon the Pennsylvania Railroad at Hagerstown but upon the Western Maryland Railway. The latter carrier does not appear as a protestant of the Commission's action.

 The gist of the carriers' contention as developed in the extensive arguments and briefs presented by their counsel, appears to be that in order to support the Commission's findings it must appear that the Commission itself found two things to be a fact: First, that the existing through route is inadequate; and second, that the prescribed new routes will be either more efficient or more economic from the carriers' operating standpoint. Since, as it is contended, the Commission has found that the existing route is adequate, a finding of one of the prerequisites being lacking, the Commission's ultimate conclusion must be rejected.

This argument, we believe, is without merit. It is based upon the false premise that the short-hauling limitation in Section 15(4) of the Act cannot be subject to *any* exception by virtue of clause (b) as long as there is *any* through route between the given termini which is satisfactory to other shippers; in other words, that there is no authority for ordering a through route to pass through any particular intermediate point. While, of course, it is true, there is no express requirement of law that routes *must* pass through particular intermediate points, and neither the short-hauling provisions nor any other provision of the Act can be read as implying such requirement (United States v. Missouri Pacific R. Co.,

and Stickell & Sons v. Western Maryland Railway Co., supra), it is illogical to say that where a carrier, as is true in the present case, is already serving a shipper by one through route, such shipper may not be heard on the question, and have the Commission determine whether he is entitled to a different and more advantageous through route. Thus, when the Commission found (255 I.C.C. 340) "that the Pennsylvania maintains sufficiently frequent service to meet all reasonable demands and that it can and does furnish adequate facilities to handle any and all grain traffic likely to be given to it at western origins for movement over its direct routes or over its routes via Hagerstown to eastern destinations," this is not to be taken as a finding which precluded the Commission from determining whether Stickell is getting, by reason of such routes, all the through route service that it is entitled to. In short, as we interpret the law, Stickell has the right to have its individual case considered from the point of view whether it is entitled to a route that is not *only* adequate, but *also* affords it "more efficient" (that is, better) or "more economic" (that is, cheaper) transportation service.

The record before the Commission shows that other plants on branch lines of the Pennsylvania are subject to back-hauls and back-haul charges. For example, a plant at Bedford, Pennsylvania, is charged 3¢. Another plant at Reading, Pennsylvania, is charged 3¼¢, and one at Frederick, Maryland, 3¾¢. But this is merely evidence of a practice and is not probative of the fairness of such practice when applied to the circumstances surrounding Stickell. Indeed, as the Commission very appropriately pointed out (255 I.C.C. 333, at page 342): "The justification for a special charge for out-of-line hauls is that routes that require such additional services are not comparable with and are less economical than routes [which] do not."

We may assume the correctness of the carriers' evidence that via the prescribed new routes the total elapsed time for shipments to move from origin to destination points would, generally speaking, be longer than over the existing route. But this is not controlling, because what Stickell is most concerned with is prompt delivery of its *products*. As to them, there is no *through* movement except in the fictional sense. Of course, Stickell must count upon receiving its grain and grain products

with reasonable promptness, so as to have on hand sufficient materials out of which to manufacture its products. But, practically speaking, the time taken for a carload of grain to reach the plant, would not control the time when a carload of the finished product would leave the plant. It is the movement from plant to customer that is really at issue.

Likewise, we believe the Commission was correct in rejecting the contention of the Pennsylvania that the routes sought are not "necessary and desirable" in the public interest because the request for same was not supported by any shipper of grain or grain products at points of origin, or by any receiver or consumer of the mixed feed at destination points. Stickell's business is substantial. Its annual production is about 60,000 tons. It shipped in the year 1940, 675 cars over the existing route via the Pennsylvania, with the back-haul to Hagerstown. It is entitled to have its case individually and fully considered and determined.

It is true the evidence introduced before the Commission by the carriers was uncontradicted to the effect that the prescribed new routes would substantially increase the number of participating carriers and the number of interchange services. For example, on traffic originating at points in Central Territory (including market points not served by the Pennsylvania), these routes would, generally speaking, substitute 4 or 5-line hauls for 2-line hauls via the Pennsylvania; and where the traffic did not originate on the New York Central or the Wabash, would, generally speaking, involve 5 or 6-line hauls.

Also, it was shown that the interchange expense incident to multiple-line hauls, as compared with single-line hauls, is substantial. For example, via the direct route of the Pennsylvania from Chicago to Salisbury, there is no extra operating expense involved for inter-carrier interchange; whereas, under the prescribed new routes, the interchange expense is an important item, in one or more instances (depending upon the precise routing) aggregating nearly $40 per assumed box car equipment of 33 tons of grain. It is upon these facts that the carriers rest their argument in its last analysis, namely, that a carrier should be permitted to restrict origin and destination territory to points over such routes as will involve as few carriers as possible.

As respects comparative freight service costs, the Pennsylvania endeavored to prove by data presented to the Commission that these costs over the prescribed new routes would be much greater than over the existing routes. For example, on the same assumed box car equipment of 33 tons to Hagerstown and of 1.34 cars of out-bound products on the basis of 24.6 car tons after milling or mixing in transit, the freight service cost from Chicago to Salisbury, over the Pennsylvania's present route was shown to be $184.10; whereas over the prescribed new routes 1 and 2, the cost was shown to be $191.18 and $232.08, respectively. However, we believe the Commission had the right to attach relatively limited value, as it did, to such cost studies, because based upon the Pennsylvania's average system costs and the average system costs of the other affected carriers, on all less-than-carload and carload freight, while in the present case, we are concerned with a heavy loading commodity, moving comparatively long distances, in well defined channels, which may well give rise to numerous different and controlling factors.

We believe it to be true, as the carriers contend, that, for the purposes of the precise issue now before us, little importance should be attached to the Commission's finding that in order to meet the demands of customers for prompt delivery, Stickell shipped 640 cars of its products from Hagerstown over the Western Maryland and the Reading, to Elsmere Junction (Delaware), thence by truck to destination points, because the comparison contemplated by clause (b) of Section 15(4) must be as between the proposed routes and existing routes by *railroad*, and a comparison of a combination rail-motortruck service with all-rail service over either routes, is not contemplated. However, when all of the other considerations which weigh most heavily in favor of the carriers and which we have just analyzed, have been given their full weight, we are completely satisfied that the Commission was justified in finding them, on the evidence presented, to be subordinate to the considerations which favor the shipper.

■ The carriers maintain that the result of permitting the Commission to prescribe the new through routes will be an arbitrary exercise of power by the Commission in violation of the due process provisions of the Fifth Amendment to the

394

Constitution. However, no claim is made that the establishment of the prescribed new routes would, in fact, be confiscatory or that the carriers have a Constitutional right to have their long-hauls maintained. The long history of the legislation involving the carriers' rights in this respect and the clear assertion in the various decisions of the Supreme Court that the carriers have no such right, would seem sufficient to refute this contention. In short, unless the Commission has erred (1) in interpreting clause (b) of Section 15(4); or (2) though correctly interpreting it, has, nevertheless, applied it in the present case in a manner not supported by substantial evidence, there can be no violation of the carriers' substantive rights.

It is claimed that the Commission's decision will establish a precedent which will have an injurious effect upon the rate structure and revenues of carriers generally—that it will lead to demand for the general application of the same principle, thereby bringing about a complete change in the structure of through routes and joint rates on grain as effects Trunk Line Territory, with resulting cross-hauling and increased expense of operation. The Commission's answer is that even if such be true, "that would be no reason for denying complainant just and reasonable through routes at the established joint rates." 255 I.C.C. at page 337. We need not, and do not, go that far, because this apprehension of the carriers is not supported by that degree of proof in the present record necessary to determine the over-all effect of this individual case, and there is enough to indicate that there may well be reasons for differentiating the situation at some, if not at all of the other transit points referred to.

There is one final point made in support of the carriers' contention, but we feel that a mere statement of it is a sufficient refutation of its application to the present case. We refer to the claim made by the Pennsylvania that since the Commission's order rests in part upon a finding of breach of duty under Section 3(4) of the Interstate Commerce Act, 49 U.S.C.A. § 3(4), requiring a carrier to "afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, * * *" the carriers are entitled to a separate hearing before the Commission with respect to whether that particular provision of the law has been violated, and that the hearing which has been had was not an equivalent.

What the Commission said on this point is as follows (255 I.C.C. at page 341): "It is the duty of carriers to afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines. That requirement of section 3(4) by necessary implication means that such interchange facilities must be adequate to handle all traffic that may reasonably be expected to require interchange at such points. It is no defense to a complaint seeking through routes necessary and desirable in the public interest to show that a carrier has failed to perform its duty to establish such facilities and that by reason of that neglect of duty it is more convenient from an operating standpoint for it to haul traffic 149 miles out of line." This is a correct interpretation of the law. Merely because the Commission has seen fit to relate the two parts of the Act to each other, is no justification for saying that the present case must be converted or extended into a hearing under Section 3(4). If, as a result of the new routes prescribed by the Commission becoming effective, new questions as to the sufficiency or equality of interchange facilities should arise, both the carriers and any shippers involved therein may seek an appropriate hearing before the Commission.

### Conclusions.

We conclude, for the reasons set forth, that the Commission has (1) correctly interpreted clause (b) of Section 15(4) of the Transportation Act of 1940; (2) has applied it in the present case in a manner supported by substantial evidence; and (3) that such application violates no Constitutional rights of the petitioning carriers. Therefore, the petition must be dismissed.

In view of the nature of this case, the Interstate Commerce Commission having made findings of fact, and this Court finding substantial evidence to support the same, it is assumed that no further or other statement of the ultimate or evidentiary facts is required under Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, beyond those stated in the opinion; and also that the conclusions of law herein need not be separately stated.